UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHARON COULTER,

              Plaintiff,                           Civil Action No. 14-CV-14404

vs.                                             HON. MARK A. GOLDSMITH

AETNA LIFE INSURANCE COMPANY,

              Defendant.

_____/

**OPINION AND ORDER (1) DENYING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT (Dkt. 24), (2) DENYING DEFENDANT'S MOTION FOR
JUDGMENT (Dkt. 27), and (3) REMANDING TO PLAN ADMINISTRATOR FOR
RECONSIDERATION OF PLAINTIFF'S CLAIM FOR BENEFITS**

## I. INTRODUCTION

       Plaintiff Sharon Coulter had been receiving long-term disability benefits through a plan

provided by her former employer, Alcoa, Inc. ("Alcoa"), since 2006.  Defendant Aetna Life

Insurance Company ("Aetna") began serving as the claims administrator for the plan and

undertook a series of reviews of Plaintiff's disability claim.  Upon the most recent review, Aetna

determined that Plaintiff no longer met the policy's definition of "total disability" and terminated

her benefits.  Plaintiff appealed Aetna's decision through the administrative review process, and

Alcoa ultimately upheld the termination.  In this Court, Plaintiff now contests Alcoa's final

termination decision, pursuant to the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. § 1001 et seq.  As explained in more detail below, certain erroneous

assumptions underlying Alcoa's final decision render it arbitrary and capricious, and the Court

remands to the plan administrator for reconsideration of Plaintiff's claim for benefits.

## II. BACKGROUND[1]

Plaintiff worked in manufacturing for an automotive division of Alcoa from 2000-2006. Def. Mot. at 3, 5 (Dkt. 27). Sometime in 2005, Plaintiff began complaining of hand pain and was eventually diagnosed with bilateral carpal tunnel syndrome. Id. at 3. It appears that Plaintiff initially applied for, and received, short-term disability benefits in January 2006, and then was approved for long-term disability benefits beginning in August 2006. Id. at 4-5.

Pursuant to the Summary Plan Document ("SPD") — which sets forth the governing terms of Alcoa's long-term disability plan — long-term disability benefits are payable upon total disability "while [a claimant is] covered under the plan and remain[s] under the care of a doctor. [The claimant] also must submit proof of [the] continued total disability when it is requested by the [long-term disability ("LTD")] claims administrator." Summary Plan Document, Ex. A to Def. Mot., at 4 (Dkt. 27-2).[2] Alcoa's definition of "total disability" is two-tiered:

> Totally disabled means that because of injury or sickness: within the first 24 months of the onset of [the] disability, [the claimant] cannot perform each of the material duties of [the claimant's] regular job; and after the first 24 months from the onset of [the] disability, [the claimant] cannot perform each of the material duties of any gainful occupation for which [the claimant is] reasonably suited by training, education, or experience.

Id. at 10.

In September 2007, Aetna informed Plaintiff that the first 24-month period was set to expire in January 2008, and thereafter Plaintiff would need to demonstrate that her disability

---

[1] The "Background" provides an overview of Plaintiff's general disability history. The administrative record in this case is voluminous, spanning several years, and much of it is not necessary to the case in its current posture. To the extent specific medical records or other documentation are relevant to the issues raised by the current motions, the applicable evidence will be discussed in more detail in the "Analysis" section of this opinion.

[2] The full plan documents have not been made a part of the administrative record. However, the SPD was attached as an exhibit to Aetna's motion for judgment.

prevented her from performing the material duties of "any gainful occupation for which [she was] reasonably suited by training, education, or experience," rather than precluding just the material duties of her former job.    Administrative Record ("A.R.") at 152 (Dkt. 30). Accordingly, Aetna initiated a review of Plaintiff's disability claim for continued eligibility under the new standard.  Id.

Following review of a self-reported questionnaire, id. at 225-228, a functional capacity evaluation ("FCE"), id. at 166-172, and an employability analysis report, id. at 570-576, Aetna concluded that Plaintiff was disabled under the "any occupation" standard, and that her benefits would continue beyond the first 24-month period, id. at 1360.  Aetna explained that Plaintiff would continue to receive benefits so long as she remained under the care of a doctor and continued to meet the plan's definition of disability; Aetna further explained that it would monitor Plaintiff's disability status, and might request verifying documentation in the future.  Id.

After Plaintiff applied for social security benefits and received a favorable determination in June 2009, id. at 928-932, Aetna initiated another review of Plaintiff's disability claim, in May 2010, by requesting information from Plaintiff's treating physicians, id. at 549.  Aetna also arranged for a physician review of Plaintiff's medical file, id. at 597-600, and a new FCE, id. at 290-298.  Aetna concluded that the review did not demonstrate total disability as defined by the plan.  Id. at 3.  However, Plaintiff was scheduled for, and underwent, shoulder surgery in December 2010, and Aetna continued to pay benefits through her recovery.  Id.

In the spring of 2011, following Plaintiff's recovery, Aetna again conducted a review of Plaintiff's claim, requesting substantiating documentation from Plaintiff's treating physician, Dr. Christopher Uggen.  Id.  Using the information provided by Dr. Uggen, Aetna solicited two labor market surveys.  Id. at 3, 577-587, 588-596.  Following this review, Aetna determined that, as of

November 14, 2011, Plaintiff was no longer disabled under the terms of the plan.  Id. at 51.  It explained that "there are insufficient findings to support [her] inability to perform the essential elements of any occupation," and "the results of the Labor Market survey report . . . indicate[ ] that jobs exist within [Plaintiff's] labor market that meet [her] level of functional abilities and the minimum wage requirements as stipulated in the Plan."  Id.

Plaintiff appealed this initial determination to Aetna in February 2012.  Id. at 6.  In response to Plaintiff's appeal, Aetna reviewed additional medical documentation, including the results of a May 2012 FCE, and requested a physician review of Plaintiff's file.  Id. at 6-7.  Following the physician review, in August 2012, Aetna upheld its decision on appeal.  Id. at 8, 30.

Plaintiff subsequently submitted her second and final appeal to Alcoa.  Id. at 8, 63.  In reviewing Plaintiff's second appeal, Alcoa, through the Benefits Appeals Committee ("BAC"), solicited two physician file reviews from a medical reviewer who had not previously been involved in Plaintiff's claim determination, the second of which was requested after Plaintiff submitted additional information for the BAC's review.  Alcoa Final Denial Letter, Ex. B to Def. Mot., at 2-3 (cm/ecf pages) (Dkt. 27-3).  The BAC then issued a final decision, upholding Aetna's initial termination of benefits and denying Plaintiff's second-level appeal "based on its review of the medical documentation, the [ ] Plan provisions, and both of the independent third-party medical reviews."  Id. at 3 (cm/ecf page).

### III.  ANALYSIS

### A.  Standard of Review

A plan administrator's decision denying or terminating benefits is reviewed under a de novo standard, "unless the benefit plan gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire</u> <u>& Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989).  When a plan vests an administrator or fiduciary with discretion, courts review only for an abuse of that discretion.  <u>Id.</u>

The thrust of Plaintiff's argument, while not entirely clear, appears predicated on two propositions: (i) that, although the plan delegates claim determinations to a third-party contractor, the plan is silent as to whether the third-party contractor has discretion in making those determinations; and (ii) that Aetna is not a named fiduciary in the plan, and discretion cannot be delegated to unnamed third-party providers.  <u>See</u> Pl. Mot. at 22-23 (Dkt. 24).  From this, Plaintiff seems to suggest that the termination decision was made by a party other than one authorized in the plan documents to make such decisions, thereby triggering <u>de novo</u>, rather than deferential, review.  <u>Id.</u>  The Court disagrees.

It is undisputed that Alcoa, through the BAC, made the final decision regarding Plaintiff's termination of benefits.  And the BAC, according to the SPD, has been tasked with overseeing the operation of the plan, which explicitly includes the discretionary authority to adopt rules to administer the plan, interpret the plan, determine eligibility under the plan, and decide issues of credibility.  Summary Plan Document at 11-12.[3]  Because it is the BAC's decision the Court must review, and the BAC is vested with discretionary authority to interpret the plan and decide claims, the appropriate standard of review is for abuse of discretion.  <u>See</u> <u>Wooden v. Alcoa, Inc.</u>, 511 F. App'x 477, 482 n.3 (6th Cir. 2013) ("[W]hether Aetna, Alcoa's designated claims administrator, has discretionary authority under the Plan is not relevant to the

---

[3] According to Aetna, at the time the SPD was drafted, the Benefits Management Committee was the entity tasked and vested with this discretionary authority, but the Benefits Management Committee has since been replaced by the BAC.  Def. Mot. at 3 n.1.

standard of review we apply.  Final appeals are decided by Alcoa (in the form of the BAC).

Alcoa is the plan administrator.  It is the plan administrator's decision we review.").[4]

In any event, the determination of which standard of review applies is not critical to the

resolution of the current motions, because the BAC's decision to uphold Aetna's termination of

benefits fails to pass even the deferential "arbitrary and capricious" test.

### B.  The Termination Decision

A plan administrator's decision denying or terminating benefits will survive arbitrary-

and-capricious review when it is reasonable in light of the plan provisions, is the product of a

reasoned and deliberative process, and is supported by substantial evidence.  See McClain v.

Eaton Corp. Disability Plan, 740 F.3d 1059, 1064-1065 (6th Cir. 2014).  Several considerations

guide the Court's review, including "the quality and quantity of the medical evidence; the

existence of any conflicts of interest; whether the administrator considered any disability finding

by the Social Security Administration; and whether the administrator contracted with physicians

to conduct a file review as opposed to a physical examination of the claimant."  Shaw v. AT&T

Umbrella Benefit Plan No. 1, 795 F.3d 538, 547 (6th Cir. 2015).

---

[4] Plaintiff also relies on Shelby County Health Care Corp. v. Majestic Star Casino, 581 F.3d 355 (6th Cir. 2009), for the proposition that de novo review is warranted when a benefits decision contravenes the process established by the plan.  Pl. Mot. at 22.  This reliance is misplaced. Unlike here, the dispute in Shelby County was not over whether a particular body had discretionary authority — the parties in Shelby County agreed that the plan administrator did, whereas the designated claims administrator expressly did not — but, rather, whether the claims administrator had improperly exercised the discretionary authority reserved to the plan administrator in making the claims decision.  Shelby Cnty. Health Care Corp., 581 F.3d at 365. In other words, the fight in Shelby County was about which body actually made the benefits decision.  There, the Sixth Circuit agreed that the plan administrator rubber-stamped the third-party administrator's decision without any independent fact-finding or review, in violation of the plan's provisions, making de novo review appropriate.  Id. at 365-367.  By contrast, there is no suggestion here that the BAC simply rubber-stamped Aetna's decision.  Alcoa's final denial letter suggests that the BAC properly undertook an independent investigation upon receipt of Plaintiff's appeal, including ordering a file review by an independent medical professional not just once, but twice, after receiving and considering additional documentation from Plaintiff. Alcoa Final Denial Letter at 3 (cm/ecf page).

Plaintiff presents three arguments why <u>Aetna's</u> termination of benefits was improper: (i) Aetna wrongfully based its termination decision on a flawed opinion rendered by its medical reviewer, without giving proper consideration to the more credible opinions of Plaintiff's treating physicians; (ii) Aetna failed to demonstrate that Plaintiff can perform the jobs identified in the labor market surveys; and (iii) Aetna improperly terminated benefits without any evidence of medical improvement. Pl. Mot. at 23, 27, 28. However, as discussed <u>supra</u>, the Court is reviewing <u>Alcoa's</u> final decision, through the BAC, upholding Aetna's termination of benefits. Thus, to the extent that Aetna's analysis and adjudication of Plaintiff's disability is somehow flawed, the flaws would be material only insofar as the BAC relied on those flaws, or otherwise incorporated them into its own final termination decision.

However, the Court need not consider possible errors in Aetna's analysis of Plaintiff's disability claim, because the BAC's own independent analysis of Plaintiff's disability claim appears to rest on a mischaracterization of the medical evidence that was the basis for a reviewing physician's conclusion that Plaintiff was not disabled under the terms of the plan. That mischaracterization was that a prior FCE showed Plaintiff qualified to perform "light-to-medium" work, when in fact it showed Plaintiff capable only of "sedentary" work. This error impacts the vocational inquiry required by the "any occupation" standard and undermines the reasonableness of the BAC's final decision. That is, the medical reviewer's faulty explanation calls into question whether Plaintiff could physically perform the vocational positions for which she was found reasonably suited, particularly when the other medical evidence of record suggests that she cannot. Because the premise underlying the decision is erroneous, the BAC's final decision is not supported by the medical evidence, and demonstrates that the decision-making process underlying the final termination decision was neither well-reasoned nor deliberative.

7

Remand is required so that the plan administrator can consider Plaintiff's claim for benefits anew, without employment of the erroneous characterization of Plaintiff's capabilities.

### 1.  Medical File Review

Following Plaintiff's first-level appeal of Aetna's termination decision, Aetna contracted with Dr. Robert Swotinsky, M.D., to complete a physician review of Plaintiff's file.  See A.R. at 11-19.  Plaintiff offers several reasons for why Dr. Swotinsky's analysis is faulty, and therefore challenges Aetna's reliance on Dr. Swotinsky's report over what Plaintiff asserts are the more credible conclusions of her treating physicians.  Pl. Mot. at 23-27.  However, while Dr. Swotinsky's report may have informed Aetna's termination decision, it is wholly unclear as to what impact, if any, Dr. Swotinsky's report had on the BAC's ultimate decision to affirm the termination of benefits.  In adjudicating Plaintiff's second-level appeal, the BAC independently sought out additional physician file reviews that took into account medical documentation not previously submitted to Aetna.[5]  Because the BAC stated that the basis of its decision included these later file reviews — now shown to be seriously flawed — any problems contained within Dr. Swotinsky's report are matters that the Court need not address.[6]

---

[5] For some reason, despite being explicitly referenced in Alcoa's final denial letter, these subsequent physician file reviews were not contained in the administrative record originally provided to the Court.  The Court inquired about these reports at a hearing on the parties' motions, and was told they were not made available.  Shortly thereafter, however, defense counsel was able to obtain the reports and, with Plaintiff's counsel's consent, provided the Court with a supplemental administrative record.  See Suppl. Administrative Record ("Suppl. A.R.") (Dkt. 31).

[6] However, the Court makes a few observations regarding Dr. Swotinsky's conclusions.  Dr. Swotinsky ultimately concluded that Plaintiff had no limitations or restrictions on her ability to work.  A.R. at 18.  In doing so, he dismissed the FCE results as unreliable due to physical indicators suggesting low effort on the part of Plaintiff as well as research, which conformed with his own personal opinion, suggesting that claimants tend to underperform at FCEs intended to inform disability decisions.  Id. at 15, 18.  However, it has been suggested that file reviewers should not make credibility determinations in the absence of an independent medical evaluation. Markey-Shanks v. Metro. Life Ins. Co., No. 1:12-CV-342, 2013 WL 3818838, at *9 (W.D.

2:14-cv-14404-MAG-DRG   Doc # 35   Filed 02/26/16   Pg 9 of 21   Pg ID 2705

Upon reviewing these additional reports, which the BAC expressly relied upon in reaching its decision, see Alcoa Final Denial Letter at 3 (cm/ecf page), the Court discovered a fundamental error in the file reviewer's conclusion that renders the benefits termination unsupported and unreasonable, independent of whatever flaws may be contained within Dr. Swotinsky's report.   Specifically, in the reviewer's explanation of findings, he or she mischaracterized the evidence of record and relied on that mischaracterization to conclude that Plaintiff was not totally disabled within the meaning of the plan.   This error is repeated in both the first and the second file reviews relied on by the BAC.

The first file review, dated February 19, 2013, found it significant that Plaintiff's most recent FCE, conducted in 2012, "determined that the patient was able to perform at a light to medium physical demand capacity."   Suppl. A.R. at 2254 (Dkt. 31-1).   The reviewer further found it significant that this 2012 FCE was performed after Plaintiff's treating physician, Dr. Uggen, had written a short and conclusory note indicating that Plaintiff was "on complete disability for indefinite," which may suggest that Dr. Uggen was of the opinion that Plaintiff was disabled.   Id.   The reviewer also relied on the fact that there were at least three FCEs "which state that the patient is able to perform at a sedentary, light or medium physical capacity level."   Id.   Importantly, however, none of the three FCEs completed in Plaintiff's case, including the most recent 2012 FCE, cleared Plaintiff for medium-level work, and the two most recent FCEs did not clear her for anything more than a restricted range of sedentary work.   Only the 2007

---

Mich. July 23, 2013).   Assuming that Plaintiff performed with low effort during all three FCEs appears to have been in part derived from a credibility determination.   Dr. Swotinsky also noted the existence of hand/thumb x-rays in the file, but indicated that they were illegible, id. at 17, which suggests that he was unable to make a proper first-hand determination regarding Plaintiff's ability to lift and/or grip using her hands.   The BAC should consider these issues on remand.

FCE suggested that Plaintiff might have been capable of performing work at the light-demand level, but, even that report, too, assessed her at a sedentary demand-level of work.

The 2007 FCE appeared to determine that Plaintiff was capable of performing full-time sedentary work, with occasional exertion of up to ten pounds and occasional walking and standing.  A.R. at 166.  Admittedly, the 2007 FCE opined that Plaintiff "performed with low effort during all testing."  Id.  Specifically, the FCE examiner noted the absence of physiological signs associated with a concerted effort — i.e. an increased heart rate or a change in respiratory effort — as well as observed seemingly inconsistent results in Plaintiff's testing.  Id. at 168.  The examiner was further unable to identify any specific limitations in Plaintiff's cervical spine or shoulder aside from Plaintiff's "self-limiting pain reports."  Id.  Consequently, the examiner considered the test results "invalid," and recommended releasing Plaintiff according to specific activity guidelines or at a slightly higher strength level.  Id. at 168-169.  According to the activity guidelines, Plaintiff could sit for two hours at any given time, stand for one hour at any given time, and walk up to thirty minutes at any given time.  Id. at 170.  Plaintiff could also occasionally bend and rotate, and could occasionally reach to the front and side with her arms, but she could never reach overhead with her right arm.  Id.  Plaintiff's ability to lift and carry was also restricted.  Id. at 170-172.  Despite the examiner's concerns regarding full effort, nowhere did the examiner suggest that Plaintiff was capable of performing medium-level work. And while the examiner tersely noted toward the end of her summary that Plaintiff was able to perform at a "sedentary to light" demand level, id. at 167, many of the enclosed activity guidelines are inconsistent with the definition of light work, as described infra in the opinion.[7]

---

[7] While the Court includes the results of the 2007 FCE report in the interest of completeness and because the BAC's file reviewer takes them into consideration, the Court stresses two deficiencies regarding the 2007 report: (i) given the date, the 2007 FCE report is likely a less reliable indicator of Plaintiff's abilities during the relevant time period than the subsequent 2010

A 2010 FCE similarly restricted Plaintiff to full-time sedentary work, allowing for occasional exertion of up to ten pounds and frequent use of negligible force. Id. at 290, 297. Additional limitations included no overhead reaching on the right side, limited handling at or below the right waist, and restricted repetitive grasping or resistive gripping with the right hand. Id. at 296-297. Plaintiff also exhibited below-average grip strength in her right hand, as well as below-average bilateral pinch strength. Id. at 295. The examiner observed "an abnormal pain focus, hyper and/or elevated pain reflection, and pain symptom magnification," id. at 292, but did not suggest that Plaintiff was capable of anything beyond the restricted range of sedentary activity.

Lastly, the 2012 FCE determined that Plaintiff could "perform within the sedentary physical demand level," but that she should avoid activities involving "firm gripping, above shoulder reaching, squatting and pinching." Id. at 614. This examiner, too, observed some inconsistencies during testing that suggested that the results were invalid and that Plaintiff was putting forth less than a full effort. Id. at 615. However, the examiner also noted that Plaintiff's abilities were hampered by "weakness and pain in her right hand," and that Plaintiff often resisted using her right upper extremity to complete the exercises. Id. Nonetheless, like the 2010 FCE, there is no suggestion in the 2012 FCE that Plaintiff was capable of performing light-to-medium workplace activity.

The second file review, dated March 14, 2013, repeats these errors. Suppl. A.R. at 2260 (Dkt. 31). This second review acknowledges newly submitted medical evidence, including medical notes from Plaintiff's treating physician documenting pain and a limited range of movement in Plaintiff's shoulder, as well as x-rays evidencing "mild carpometacarpal arthritis"

---

and 2012 FCEs; and (ii) the inconsistency within the FCE's report creates uncertainty as to the actual recommendation.

2:14-cv-14404-MAG-DRG   Doc # 35   Filed 02/26/16   Pg 12 of 21   Pg ID 2708

in her right thumb.  Id. at 2260-2261.  However, rather than address these most recent objective findings regarding Plaintiff's shoulder, the review merely states that Plaintiff had completed three FCEs, including one in 2012 subsequent to her shoulder surgery, "all of which note that the patient is able to perform work at a light to medium level."  Id. at 2261; see also id. at 2262.  The file reviewer specifically states: "The submitted notes contain no information which would contradict the previous conclusions and do not change the fact that previous [FCEs] have indicated that Ms. Coulter is able to perform a medium to light job.  Therefore the conclusion is that the patient is not permanently and totally disabled according to the [plan]."  Id. at 2261 (emphasis added); see also id. at 2262 (same).  However, as detailed above, all three FCEs seemingly recommend a restricted range of sedentary activity, including limitations on reaching, lifting, and/or gripping.  To reiterate, none of the three FCEs explicitly cleared Plaintiff for light- or medium-level activity.

In sum, the file reviewer rested his or her conclusion that Plaintiff was not disabled under the meaning of the plan on an erroneous premise.  These errors cast significant doubt on the quality and accuracy of the file reviewer's reports.  See Holler v. Hartford Life & Accident Ins. Co., 737 F. Supp. 2d 883, 892, 899 (S.D. Ohio 2010) (when opinion of non-examining file reviewer hired by defendant "was based on a review and summary of the record which mischaracterizes and gives a mis-impression of the evidence related to" the alleged impairments, court viewed opinion and decision based on that opinion "with some skepticism" and concluded that denial of disability was "neither reasonable nor rational").

Indeed, the mischaracterization of the evidence of record is particularly troublesome considering that the reviewer accurately recited the FCE results elsewhere in his or her review. See Suppl. A.R. at 2251 (noting that a 2007 FCE determined Plaintiff had less than sedentary

12

functional capacity with severe restrictions on her upper extremities); id. at 2252 (noting that an FCE concurred in an earlier consulting physician's recommendation that Plaintiff was capable of performing sedentary work); id. (noting that Plaintiff tested at a sedentary level in a 2010 FCE, which determined that she could return to full-time sedentary work); id. at 2252-2253 (relaying that a 2012 FCE demonstrated Plaintiff could perform at a sedentary level).[8]

Because the BAC explicitly relied on the file reviewer's explanation to affirm Aetna's termination decision, the BAC's decision is neither reasonable nor supported by sufficient evidence. See Moon v. Unum Provident Corp., 405 F.3d 373, 381 (6th Cir. 2005) ("It is not enough for Unum to offer an explanation for the termination of benefits; the explanation must be consistent with the 'quantity and quality of the medical evidence' that is available on the record."); Willcox v. Liberty Life Assur. Co. of Boston, 552 F.3d 693, 700-703 (8th Cir. 2009) (finding an abuse of discretion when relying on a medical reviewer's report that "mischaracterizes the medical evidence in several important respects"); Whitehouse v. Raytheon Co., 672 F. Supp. 2d 174, 179-181 (D. Mass. 2009) (finding denial of benefits arbitrary and capricious when the defendant "repeatedly mischaracterize[d] the findings of [the plaintiff's] doctors, fail[ed] to address important evidence in the record, and d[id] not support its factual assertions").

### 2.  Vocational Analysis

In its motion and at oral argument, Aetna relies heavily on the lack of objective medical evidence demonstrating total disability or severe impairment, contending that this, independently, is sufficient to justify termination of Plaintiff's long-term benefits.  See Def. Mot.

---

[8] The Court points out another unexplained facet of the file reviewer's action.  The reviewer contacted Plaintiff's former treating physician, Dr. Levin, who could not recall Plaintiff and had not seen her in a number of years, but failed to contact a more recent treating physician who had seen her within the last few years.  Suppl. A.R. at 2249, 2255.

at 26-30. Aetna consistently takes the position that the medical evidence demonstrates "Plaintiff's ability to perform some level of physical work, usually at the 'sedentary' or 'light' work level with appropriate accommodations." Id. at 23 (emphasis in original).[9]

It may be true that Plaintiff is capable of performing work at a sedentary level. However, a failure to specify the type of work a claimant can perform may render a termination of benefits arbitrary and capricious. Brooking v. Hartford Life & Accident Ins. Co., 167 F. App'x 544, 549 (6th Cir. 2006) (citing to McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 171-172 (6th Cir. 2003) (finding it significant that although a doctor opined a claimant could return to work the doctor did not indicate what type of work the claimant could perform)). And, importantly, "[j]ust as a plan administrator must conduct some inquiry into the nature and transferability of a claimant's job skills, a plan administrator must make some inquiry into whether the jobs selected are ones that the claimant can reasonably perform in light of specific disabilities." Id.; Couch v. Cont'l Cas. Co., No. 06-80 (WOB), 2007 WL 2736250, at *7 (E.D. Ky. Sept. 18, 2007) ("The defendant's reliance on the defective [employability] evaluation renders its decision arbitrary and capricious."). However, Alcoa has failed to do this.

The 2011 labor market surveys solicited by Aetna rely on a capabilities and limitations worksheet completed by Dr. Uggen, in what appears to be July 2011, supporting Plaintiff's ability to "[c]ontinuous[ly] climb . . . , lift up to 50lbs, push/pull, reach above shoulder, reach forward, . . . hand grasp, firm hand grasp, fine/gross manipulate," among other capabilities. A.R. at 577, 588; see also id. at 544 (capabilities and limitations worksheet endorsing no restrictions).

_____

[9] See also Def. Mot. at 19 ("The evidence regarding Plaintiff's medical condition and functional capabilities plainly demonstrates that Plaintiff has the ability, at a minimum, to perform sedentary work."); id. at 24 ("Ultimately, none of Plaintiff's arguments in this regard rebut the essential showing in this case: that Plaintiff is capable of performing sedentary work in positions that offer appropriate accommodations." (emphasis in original)); id. at 25 ("[N]early every medical professional who has treated Plaintiff or reviewed her medical history has concluded that Plaintiff is capable of some level of work, albeit work of a sedentary nature.").

The surveys go on to identify two occupations for which Plaintiff was suited based on these physical attributes and her overall background: (i) industrial cleaner and (ii) assembler.  Id. at 577, 588.[10]  These positions are classified as "medium" and "light," respectively.  Id. at 577, 588.

The BAC's reliance on the recommendations of the surveys is troubling for two reasons. First, the surveys were put together prior to the 2012 FCE and without consideration of additional, post-2011 medical documentation submitted by Plaintiff on her first and second-level appeals.  See Kouns v. Hartford Life & Accident Ins. Co., 780 F. Supp. 2d 578, 588 (N.D. Ohio 2011) (finding that the fact that a final decision rested "on an employability analysis that was never updated to include accurate medical information" should be considered in determining whether the decision was arbitrary and capricious, and then concluding that the decision was arbitrary and capricious).   Second, medical evidence — in particular, medical evidence subsequent to the 2011 surveys — suggests Plaintiff is not physically suitable for the identified positions.  The BAC's file reviewer's conclusion that Plaintiff can perform light-to-medium work is unreliable.  As detailed above, the two most recent FCEs — including the 2012 FCE completed almost a year after the capabilities and limitations worksheet — cleared Plaintiff for sedentary work only, and only the 2007 FCE report suggested that Plaintiff may have been capable of light work.   The later FCE results are consistent with other post-2011 medical evidence that recommend limitations or restrictions at odds with the physical attributes set forth in the surveys.  See A.R. at 26-27 (in August 2012, documenting pain and restricted range of motion in Plaintiff's upper extremities); id. at 613 (in May 2012, recommending sedentary work, including restrictions on reaching, handling, and squatting).   Even assuming the merits of

---

[10] Because there is no suggestion that the BAC conducted its own independent labor market survey or employability analysis, the Court infers that the BAC relied on Aetna's 2011 labor market surveys in determining whether there was gainful employment for which Plaintiff was, in all relevant respects, suited.

Aetna's position, then — that Plaintiff can at least perform sedentary activities — there is very little indication that Plaintiff can perform the non-sedentary jobs selected for her by the 2011 labor market surveys.[11]

---

[11] The Dictionary of Occupational Titles, which appears to be the source for the jobs selected for Plaintiff, see A.R. at 577, 588, explains the physical demands associated with each strength category of work. The below descriptions demonstrate the different type and degree of physical activity necessary for each tier of strength, highlighting the importance of properly matching a claimant with a suitable demand-level of work.

Sedentary-level work requires:

> Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

Whereas light-level work demands:

> Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

And, finally, medium-level work involves:

> Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10

In addition to challenging the actual jobs selected for her by the 2011 labor market surveys, Plaintiff also contends that there is no evidence that there are more job positions available to her now than there were in 2007. Pl. Mot. at 28. Aetna agrees that availability of positions is a relevant consideration, because Aetna states that Plaintiff's initial eligibility for long-term disability status under the "any occupation" standard was premised on her employability (or more accurately, lack thereof) due to economic factors and not on physical disability. See Def. Mot. at 25-26; A.R. at 575.[12] Specifically, the 2007 employability analysis limited Plaintiff to sedentary work and identified four possible occupations for which she was reasonably suited. A.R. at 572-573. However, the employability analysis concluded that Plaintiff was not employable because (i) the identified occupations were "not directly transferable to [Plaintiff's] training and work background"; (ii) there was "very limited growth" associated with those positions; and (iii) there was a 7.3% unemployment rate in Plaintiff's geographic region. Id. at 575. Aetna submits that the 2011 labor market surveys "identifying multiple occupations, each of which had multiple positions available that also met Plaintiff's functional capabilities and wage requirements," amount to evidence that employment prospects for Plaintiff have improved since 2007. Def. Mot. at 26.

Aetna's position, however, is not supported by the record. The initial 2007 employability analysis relied on the number of average job openings per year based on both replacement needs

---

pounds of force constantly to move objects. Physical Demand requirements are in excess of those for Light Work.

See Dictionary of Occupational Titles, Appendix C – Components of the Definition Trailer, 1991 WL 688702.

[12] Aetna provides no argument or authority as to why those same considerations would not be relevant to the present disability determination. Rather, its argument is confined to a factual one: that the circumstances have changed since the 2007 disability determination. Def. Mot. at 26.

and on growth.  Several of the positions for which Plaintiff was found eligible appeared to have expected openings in her geographic region, on at least one of those grounds, but the 2007 analysis concluded that these numbers were insufficient given that the jobs were not directly transferable to Plaintiff's skills and the high unemployment rate in the area.[13]  In contrast, most of the jobs identified in the 2011 surveys, and which met the criteria for Plaintiff's qualifications, physical restrictions, and wage requirements, had no current openings, and the employer-contacts were "unsure" of whether they would be hiring in the next six months; there is no other evidence of anticipated job opportunity.  See A.R. at 578-584, 589-595.  To the extent the BAC relied on, even in part, such an unsubstantiated ground in concluding that Plaintiff was no longer disabled within the meaning of the plan, it further indicates that the 2011 disability decision was reached in an arbitrary and capricious manner.[14]

---

[13] The 2007 report specifically provides the following information for each identified occupation: (i) zero average annual openings due to growth and three average annual openings due to replacement for assemblers; (ii) zero average annual openings due to growth and two average annual openings due to replacement for telemarketers; (iii) 13 average annual openings due to growth and 150 average annual openings due to replacement for cashiers; and (iv) zero average annual openings due to growth and two average annual openings due to replacement for order clerks.  A.R. at 574.  Projections were stated as specific to the "state of Michigan/Muskegon-Norton Shores MSA."  Id.

[14] Notably, nowhere does the BAC's final denial letter suggest that Plaintiff's improved prospects for employment played any role in its decision to uphold Aetna's termination of benefits.  Rather, the BAC's final decision was premised on "its review of the medical documentation, the [ ] Plan provisions, and both of the independent third-party medical reviews," and concludes that, "the medical documentation provided does not indicate a totally disabling condition as defined by the Plan that prevents you from performing the material duties of any gainful occupation for which you are reasonably suited by training, education, or experience."  Alcoa Final Denial Letter at 3 (cm/ecf page).  Aetna's letter accompanying Plaintiff's first-level appeal similarly does not make any reference to Plaintiff's improved prospects for employability since 2007, see A.R. at 35-37, although the initial termination letter states, "the results of the Labor Market survey report . . . indicate[ ] that jobs exist within your labor market that meet your level of functional abilities and the minimum wage requirements," id. at 51.

### C. Remedy

Having concluded that the BAC's decision to affirm Aetna's termination of long-term disability benefits was arbitrary and capricious, the Court is left to fashion a remedy. Plaintiff, naturally, would have the Court award long-term disability benefits, including retroactive benefits, and issue a declaratory judgment that she is entitled to disability benefits going forward. Plaintiff argues that there is no evidence of medical improvement, thereby providing no basis for any decision other than a favorable one. See Pl. Mot. at 28-30. Aetna, on the other hand, prefers remand in light of Plaintiff's arguments that Aetna/the BAC did not fully consider all of her ailments and the extent to which they cause her functional impairments.

While Plaintiff is correct that Aetna/the BAC must provide some reasonable explanation for the decision to terminate previously awarded benefits, she is incorrect that the decision must rest on evidence of medical improvement. See Morris v. Am. Elec. Power Long-Term Disability Plan, 399 F. App'x 978, 984 (6th Cir. 2010) ("[T]he ultimate question is whether the plan administrator had a rational basis for concluding that [the plaintiff] was not disabled at the time of the new decision. Under the any-occupation standard at issue in this case, any number of factors could be germane to such a determination . . . ." (emphasis in original)). Accordingly, a change in Plaintiff's employability prospects (while, admittedly, unclear here) may be sufficient for Aetna and the BAC to reverse course and declare Plaintiff not disabled within the meaning of the plan.

In ERISA cases, courts have the authority to either award a claimant her benefits or to remand to the plan administrator. Elliott v. Metro. Life Ins. Co., 473 F.3d 613, 621 (6th Cir. 2006). When the problem lies with the integrity of the decision-making process, rather than the claimant being denied benefits to which she was clearly entitled, remand is the appropriate

19

remedy.  Id. at 622.  For instance, remand is appropriate when the decision suffers from a procedural defect (i.e., a failure to comply with ERISA notice-appeal requirements), or if the administrative record is factually incomplete (i.e., a failure to sufficiently explain the grounds on which the decision was made).  Shelby Cnty. Health Care Corp. v. Majestic Star Casino, 581 F.3d 355, 373 (6th Cir. 2009).  Conversely, remand is inappropriate if the record contains no evidence supporting a termination or denial of benefits, or when the plan administrator, while properly construing the plan documents, simply reaches the wrong conclusion.  Id. at 373-374.  In those circumstances, there are no additional facts to develop or findings that a plan administrator would need to make with respect to the plaintiff's claim; remand would be a useless formality.  Id. at 374.

The circumstances presented by this case do not cleanly fit into either category.  Rather, the bulk of the BAC's error results from an erroneous premise that may have prompted the conclusion that Plaintiff was not disabled within the meaning of the plan.  The mistaken conclusion that certain medical evidence demonstrated Plaintiff's ability to perform light-to-medium-level work may have infected the remainder of the decision-making process, specifically as it related to Plaintiff's ability to perform the light- and medium-level jobs identified in the 2011 labor market surveys.  When presented with a proper recitation of the evidence, the BAC might be entitled to reach a similar conclusion, albeit on different grounds.  As such, the current error may be more akin to a failure to sufficiently explain the grounds underlying the decision, rather than reaching the wrong conclusion.  On this record, there is no clear entitlement to benefits and, in light of the above-mentioned defects, the Court believes that there are additional facts to develop and findings to be made as to Plaintiff's functional ability and whether she is physically suited for the jobs selected for her.

## IV.  CONCLUSION

For the above reasons, the Court denies both Plaintiff's motion for summary judgment (Dkt. 24), and Defendant's motion for judgment (Dkt. 27).  The matter is remanded to the plan administrator for reconsideration of Plaintiff's claim for benefits.

SO ORDERED.

Dated:  February 26, 2016                    s/Mark A. Goldsmith
     Detroit, Michigan                      MARK A. GOLDSMITH
                                         United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 26, 2016.

                                        s/Karri Sandusky
                                        Case Manager